FILED

2008 Aug-22  PM 04:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SHERIKA TOWNSEND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case  No. CV-06-BE-1516-S** |
| | ) | |
| **JEFFERSON COUNTY, et. al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | | |

**<u>MEMORANDUM OPINION</u>**

This matter is before the court on "Jefferson County, Alabama's Motion to Dismiss Cross-Claims" (doc. 64); "Deputy Chambers and Deputy Daniels' Motion for Summary Judgment" (doc. 77); "Sheriff Hale and Chief Costa's Motion for Summary Judgment" (doc. 79); "Defendant Sallie Langston's Motion for Summary Judgment" (doc. 81); and responses to those motions.  For the reasons stated in this memorandum opinion, the court will:

1. GRANT Hale and Costa's motion for summary judgment as to Counts I, V, and VIII; DISMISS Count III to the extent that it states a claim against Hale and Costa for providing inadequate funding for inmate/detainee healthcare in the Jail;  GRANT Hale and Costa's motion for summary judgment as to the remaining claims in Count III;

2. DENY the motion for summary judgment of Deputies Chambers and Daniels as to Counts II and VI;  DISMISS Count IV as duplicative of Count II;

3. DENY the motion for summary judgment of Sallie Langston; and

4. GRANT Jefferson County's Motion to Dismiss and DISMISS all cross-claims against

1

Defendant Jefferson County.

## I. PROCEDURAL SUMMARY

In August of 2006, the Plaintiff, Sherika Townsend, filed an eleven-count complaint "to vindicate [her] rights under the United States Constitution[1], the Alabama State Constitution, and under the statutory laws of the United States and Alabama" (doc. 1) against the following defendants: Jefferson County, Alabama; Jefferson County Sheriff  Mike Hale (in his individual and official capacities); Deputy Chief J. Paul Costa (in his individual and official capacities); Deputy Arlene Chambers (in her individual and official capacities); Deputy Brandy Gosha Daniels (in her individual and official capacities); and nurse Sallie Langston (in her individual and official capacities).  Townsend alleges that the Defendants' actions or inaction resulted in the miscarriage and pain that she suffered while an inmate at the Jefferson County Jail.  On May 10, 2007, Defendants Hale, Costa, Chambers, and Daniels filed cross-claims against Defendant Jefferson County, alleging that Jefferson County d/b/a Cooper Green Hospital is liable for all or part of Townsend's claims against them  regarding medical treatment and/or the failure to provide medical treatment to Townsend while she was detained at the Jefferson County Jail, Birmingham Division.

In response to motions to dismiss filed by Hale, Costa, Chambers and Daniels, the court previously dismissed with prejudice the Fourth Amendment claims in Counts I and II; all federal and state claims against Defendants Hale, Costa, Chambers and Daniels in their official

---

[1]Although Townsend did not specifically identify 42 U.S.C. § 1983 as the vehicle for her constitutional claims, Defendants assumed her federal claims to be brought under § 1983.  Because no direct action under the constitution exists, this court will also assume that § 1983 is the vehicle for Townsend's constitutional claims for purposes of this motion.

capacities; and all state law claims against Defendants Hale, Costa, Chambers, and Daniels in their individual capacities. (doc. 24).  In response to Townsend's own motion to dismiss, the court dismissed without prejudice all of Townsend's claims against Defendant Jefferson County and all claims under state law against all Defendants.  (doc. 61).

Townsend's remaining claims against Defendants Hale and Costa in their individual capacities only are:

Count I:    Fourteenth Amendment violation: Creating an Atmosphere that Tolerates Guards' Neglectful/Wanton Behavior to Inmates and Failing to Train the Guards re Medical Care;
Count III:   Fourteenth Amendment violation:  Failing to Provide Adequate Funding for Inmate Medical Care, Failing to Provide Adequate Funding for Jail Staff Positions, and Failing to Hire a Jail Physician;
Count V:    Fourteenth Amendment violation:  Establishing a Pattern & Practice of Inadequate Staffing;
Count VIII: Fourteenth Amendment violation:  Failing to Adequately Train & Supervise;

Townsend's remaining claims against Defendants Deputy Chambers and Deputy Daniels in their individual capacities only are:

Count II:    Fourteenth Amendment violation: Deliberate Indifference to Serious Medical Needs;
Count IV:   Fourteenth Amendment violation: Failure to Provide or Secure Adequate Medical Treatment;
Count VI:   Fourteenth Amendment violation:  Failure to Intervene.

Townsend's only remaining claims against Defendant Sallie Langston are:

Count II:    Fourteenth Amendment violation:  Deliberate Indifference to Serious Medical Needs;
Count IV:   Fourteenth Amendment violation: Failure to Provide or Secure Adequate Medical Treatment.

The court notes the overlap between some of these counts.   The only claims remaining against Jefferson County are cross-claims, which it seeks to have dismissed.

3

Defendants Hale, Costa, Daniels and Chambers filed Motions for Summary Judgment (docs. 77 & 79), raising their entitlement to qualified immunity from suit, as government officials acting within their discretionary authorities.  They further deny that they violated Plaintiff's constitutional rights because they did not act with deliberate indifference, and assert that their actions or inactions did not cause Plaintiff's miscarriage.

Defendant Langston filed her own Motion for Summary Judgment (doc. 81), denying that she violated Plaintiff's constitutional rights because she did not act with deliberate indifference.  Further, she asserts that her actions or inactions did not cause Plaintiff's miscarriage.

## II.  FACTUAL SUMMARY

Viewed in the light most favorable to the Plaintiff (*see Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007)), the following facts are material to the resolution of the instant motion.

This lawsuit involves Townsend's confinement in the Jefferson County Jail, Birmingham Division in September of 2004 and her miscarriage during that confinement.        On September 24, 2004, Townsend was arrested on an outstanding warrant for failure to appear on the charge of possession of a controlled substance, and was booked into the Jail.   At the time of her pre-trial detention in the Jail, Townsend was pregnant and under the influence of crack cocaine. Townsend knew that she was pregnant and yet, used crack cocaine and smoked cigarettes every day of her pregnancy, including September 23, the day before her incarceration.  She knew that using cocaine during her pregnancy could cause a miscarriage.

Townsend was booked into the Jail at 1:08 a.m. on September 24, 2004.  At approximately 4:50 a.m., Townsend met with a female nurse who filled out a health screening

4

form, and Townsend advised the nurse on duty that she was pregnant.  (Defendant Nurse

Langston was not the nurse who filled out this form; she did not arrive at the Jail until

approximately 3:00 p.m.)  At 6:00 or 7:00 a.m., Townsend was taken to Level 5 of the Jail and

placed in cell F-9 with two other inmates, April Nix and Catarina Mejia.  Although Townsend

claims that Deputies Daniels and Chambers were working on Level 5 with a third deputy when

she arrived there, Jail records indicate that they began working at that level at 2:00 p.m. and 3:15

p.m., respectively.  Deputy Chambers worked the day shift at the Jail's Level 1, beginning at 6:00

a.m.  Because the evening shift was short one deputy on Level 5, Chambers' supervisor asked her

to work the evening shift, 2:00 p.m. through 10:00 p.m., and Chambers reported to work on

Level 5 beginning at approximately 3:15 p.m.  As Deputy Daniels was pregnant and Jail policies

did not permit her to have direct inmate contact, she was restricted to Level 5's control room.

At some point during the course of the day, Townsend began experiencing abdominal

pain and bleeding.  A dispute exists over when Townsend and her cell mates first advised Jail

deputies about this problem.  Townsend sets the first communication at approximately 10:00

a.m., when she was outside the cell with other inmates on her "block."[2]  However,  the deputies

set this first communication between 7:18 p.m. and 8:00 p.m. (doc. 77, Ex. 7, p. 17) and

Townsend's roommate, April Nix, sets the first communication between 6:00-6:30 p.m. (doc. 83,

Ex. E).   In any event, to make this communication, Townsend or one of her cell mates  pushed

an intercom button either in the area outside the cell or in the cell itself and told the deputy over

---

[2]Townsend claims that, during this first communication via intercom, Deputy Daniels answered.   If Jail
records are correct, however, Deputy Daniels did not begin work until 2:00 p.m. and any response from Deputy
Daniels would have had to occur in the afternoon or evening.  Townsend did not have a watch in the Jail that day.
Townsend's cell mate, April Nix, sets the time of the first intercom call about Townsend's pain and bleeding to be
"about the same time" as Deputy Chambers arrived at the cell with her wand  (7:18 p.m., according to Jail records).

the intercom that Townsend was pregnant and  "spotting."  Deputy Daniels advised her that she

would get the nurse as soon as possible.  Townsend claims that the nurse did not arrive for three

to four hours after her first intercom call to Deputy Daniels.  During that lapse of time,

Townsend's pain and bleeding worsened.  Before the night was over, Townsend claims that she

and her cell mates, Nix and Mejia, pushed the intercom buttons outside the cell and later, inside

the cell, to ask for medical help approximately ten times.  They claimed that they talked not only

to Deputy Daniels but also to Deputy Chambers and that both Deputies were "*rude* and *unhelpful*

the whole time." (doc. 83, Ex. E) (emphasis in original).

 At 7:00 p.m., Deputy Chambers began checking F-Block of Level 5, where Townsend's

cell was located.  As part of the Jail monitoring procedures, deputies use a wand device that

records data and documents the deputy's progress through a cell block.  The information

downloaded by Townsend's wand shows that she checked Townsend's cell, F-9, at 7:18 p.m.

According to Deputy Chambers, when she reached Townsend's cell, Townsend told her for the

first time that she was pregnant, spotting, and did not feel well.  Nix stated that Deputy Chambers

responded to Townsend rudely, telling her to lie down and asking her "in a crappy way if she had

been tested here [for pregnancy] and was she on the docket as being pregnant." (doc. 83, Ex. E).

Chambers advised Townsend to wear one of the sanitary pads provided and to show the pad to

the nurse.

According to Deputy Daniels, she first learned of Townsend's pregnancy and problems

between 7:30 p.m. and 8:00 p.m., when Townsend's cell mates called her in the control room

over the intercom system.  Daniels claims that the cell mates were "ranting and raving" on the

intercom, trying to talk at the same time and informing her that their roommate was "spotting and

6

vomiting.  Her stomach was hurting."  (doc.  77, Ex. 7, p. 18).  Daniels told them that she needed

to talk to the person who was having the problem.  Townsend got on the intercom, confirmed

what her cell mates said about her symptoms, and told Daniels that she was pregnant.  (doc. 77,

Ex. 7, p. 18-19).  Daniels told Townsend that her problems could be "normal" (presumably,

Daniels was referring to side effects of pregnancy) but advised her to see the nurse who was at

the F-Block "slider" – the main door of the cell block –  at that time. (doc. 77, Ex. 7, p. 18-20).

Deputy Daniels called Nurse Langston at the slider to inform her that an inmate was complaining

of stomach pain and vomiting and was coming to the slider door to see her.  After talking to

Townsend in her cell, Deputy Chambers also advised Nurse Langston of Townsend's problems.

As she was talking to Nurse Langston at the slider, Deputy Chambers learned from Deputy

Daniels that Townsend had also complained to the control room and that Daniels had instructed

her to see the nurse.

  All parties agree that Townsend saw Nurse Langston for the first time after 7:30 p.m.,

when the nurse arrived at the slider door of Level 5 to administer medication.  Nix stated that

Townsend's pain and bleeding had worsened by that point, and when Nix went to the slider, she

advised Langston of Townsend's condition.  In response, Nix stated that Langston "looked at me

as if I was stupid."  (doc. 83, Ex. E).  Returning to her cell, Nix found Townsend "curled up

crying," so she hit the intercom button again, while Mejia went to the slider to see Langston.

(doc. 83, Ex. E).   When Daniels responded to the intercom call, Nix updated her on Townsend's

condition.  According to Nix, "[w]homever answered the [intercom] yelled at me & told me to go

tell the damn nurse cause she's at the slider.  So I walked back up there where Cathy [Mejia] was

telling the nurse & she said in a hateful way that she needed to bring the bloody pad up there."

7

(doc. 83, Ex. E).

Townsend claims that she went to the slider door with a sanitary pad with some blood on it. However, Nurse Langston claims that Townsend brought back a piece of tissue with a pink spot and that Townsend was calm and did not exhibit any outward signs of pain, such as grabbing her abdomen or bending over in pain. According to Townsend, Nurse Langston said that the tissue or pad did not contain enough blood to indicate an emergency, that she was overreacting, and that she needed to calm down. Nurse Langston testified that she recognized that Townsend needed further examination. According to the nurse, because Townsend's symptoms at the time of her visit to the slider door did not indicate an emergency, she advised Townsend that she would return in approximately ninety minutes, after she finished administering pills. Both deputies heard Langston advise Townsend that she would see her after her "pill pass" duties. According to Langston, her plan was to enlist the help of Nurse Carr, who was a registered nurse and who could conduct a more thorough examination than Langston, an LPN. Chambers was on the F-Block at this point and claims that she offered Townsend a sandwich, but Townsend does not recall that offer. At some point, Townsend was placed in a consultation room, and she eventually went back to her cell.

Chambers spoke with Nurse Langston after the nurse saw Townsend. Nurse Langston indicated to the deputy that she did feel that Townsend exhibited signs of an emergency and Chambers understood that the nurse would nevertheless call a doctor. Chambers similarly claims that she understood, based on her own observations of Townsend and upon Nurse Langston's communication, that Townsend's condition did not represent an emergency. If she had perceived Townsend's condition to be an emergency, she claims that she would have taken Townsend to

8

Level 3, the medical floor, or called a "Code White." Deputy Chambers testified that, while she was on duty, no medical personnel called or personally requested that she escort Townsend to the medical clinic. Deputy Chambers also testified that she did not recall receiving any intercom calls from Townsend or her cell mates. Although she was not in the control room at all times, she claims that if they had called repeatedly, she would have heard the intercom.

After Townsend returned to her cell from seeing Langston, her condition continued to deteriorate. Nix claims that she and Mejia hit the intercom button again, although they were "scared about keeping [sic] hitting it." (doc. 83, Ex. E). When they tried to update the deputy on Townsend's condition, the deputy responded that Townsend's condition was "Fuckin' normal" and that "she needed to learn the differance [sic] between spotting & bleeding heavy" and "that the nurse would see her after pill call." (doc. 83, Ex. E). Townsend continued to experience bleeding and pain and her condition worsened. Mejia describes Townsend at this point as "moaning, cussing, and complaining." (doc. 83, Ex. F).

Deputy Chambers left duty on Level 5 at approximately 9:30 p.m. Between 9:30 and 10:00 p.m., after Nurse Langston finished administering medication, she went down to Level 3 to ask Nurse Carr if she would see Townsend and Nurse Carr agreed. A dispute exists regarding whether Nurse Langston called the control room from Level 3 and asked that Townsend be brought to the medical clinic. Nurse Langston claims to have called the control room of Level 5 twice within a ten to fifteen minute period with this request. She further claims that the deputy in the control room advised Langston that she was alone and no one was available to accompany Townsend at that time. Nurse Langston believed that she spoke to Deputy Chambers when she called the control room, but Deputy Chambers disputes this claim and the Jail records indicate

that Deputy Chambers left duty at 9:30 p.m.  Deputy Daniels also disputes Nurse Langston's claim about the phone calls to the control room, testifying that she and Deputy Preston were both on Level 5 between 10:00 p.m. and 10:23 p.m. and that she never spoke with Nurse Langston during that time period or heard that Nurse Langston had made a request for Townsend to be brought to the clinic.

Deputy Preston arrived to work the morning shift at approximately 10:00 p.m. on September 24, 2008.  At approximately 10:13 p.m., Deputies Preston and Daniels received the intercom call from Townsend's cellmates, advising that Townsend was on the toilet with a "baby hanging out." (doc. 88, Ex. 7, p. 52).   Deputy Preston responded and medical personnel were notified.  Nurse Langston, Nurse Carr, and Nurse Johnson immediately went to Townsend's cell where Carr examined Townsend and confirmed that she was suffering a miscarriage.  Subsequently, the paramedics were called and Townsend was placed on a stretcher and left Level 5 at 10:35 p.m.  Soon thereafter, she was transported by ambulance to Cooper Green Hospital.  At Cooper Green Hospital, Townsend was treated, and a D&C was performed.  No doctor at the hospital advised Townsend that any measures could have been taken that day to prevent the miscarriage.

Defendant Mike Hale served as sheriff of Jefferson County, Alabama at the time of the incident made the basis of this suit.  As sheriff, Hale delegated the responsibility for the day-to-day operations of the Jefferson County Jail, Birmingham Division to his Chief of Corrections, Defendant Paul Costa.  Neither Sheriff Hale nor Chief Costa had any contact with Townsend when she was in the Jail, nor do they have personal knowledge of the events upon which Townsend's allegations are based.  Neither Sheriff Hale nor Chief Costa exercised direct

supervision over the deputy sheriffs working in the Jail; Costa's subordinates – the captain, lieutenants, and sergeants – directly supervised the deputies but would have brought any problems in the Jail to Chief Costa's attention.  Neither Sheriff Hale nor Chief Costa personally trained the deputy sheriffs working in the Jail.  Sergeant Debbie Guy trained them, and Townsend does not deny that they received adequate training.  Prior to the incident involving Townsend, no one notified Chief Costa or Sheriff Hale of any issues regarding lack of supervision, lack of proper deputy training, or lack of adequate staffing at the Jail.

At the time that Townsend was in the Jail, Jail procedures called for two deputies to be working on each floor.  One deputy was assigned to the control room (tower/cube) and the other deputy worked the blocks and made the rounds.  Under no circumstances could a deputy sheriff leave the control room unattended.  If a problem arose, such as a fight breaking out among inmates or an attack on the deputy outside the control room, etc.,  the deputy in the control room was to remain in the control room but would make the necessary "code" call to the Jail Central Control for available Jail personnel to respond.  Medical personnel were advised of the Jail policy requiring one deputy to remain in the control room at all times.

Since February of 2004, Cooper Green Hospital has accepted responsibility for Jail inmate healthcare, and Jefferson Metropolitan Health Care Authority ("MHCA") has provided medical services in the Jail.  The medical personnel working at the Jail at the time of the incident made the basis of this lawsuit were employees of MHCA and not employees of Jefferson County or the Office of Sheriff.  The deputy sheriffs working in the Jail were trained to respond to medical emergencies by calling a "Code White" so that medical personnel would come to the floor with the emergency, or, depending on the circumstances, a deputy might take the inmate to

11

the medical floor.  In any event, the goal of medical emergency procedures is to facilitate contact between the inmate and medical personnel as quickly as possible.  If a medical issue did not appear to be an emergency, deputy sheriffs – including Deputy Chambers and Deputy Daniels – were trained to call medical personnel about the inmate's issue.

### III.  LEGAL STANDARD

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying [the evidence that demonstrates] the absence of a genuine issue of material fact.  *Id.*  at 323.  After the moving party demonstrates an absence of evidence to support the nonmoving party's case, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  A dispute of material fact is genuine if a reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the nonmoving party.  *See Wright v. Sanders Lead Co.*, 2006 WL 905336 , *8-9 (M.D. Ala. 2006) *aff'd,* 217 Fed. App'x 925 (11th Cir. 2007) *(citing Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989)).

When considering a motion for summary judgment, a court must view the facts "in the light most favorable to the non-moving party . . . . ." *Harris*, 127 S. Ct. at 1776. The court does not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on whether a genuine issue of material fact exists. *Anderson,* 477 U.S. at 249. Where a reasonable fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007). "[T]he plain language of Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The legal standard for qualified immunity is complex and this court will discuss it at length later in this opinion.

## IV.  DISCUSSION

### A.  Hale andCosta

In their Motion for Summary Judgment, Defendants Hale and Costa raise their status as government officials and claim the protection of qualified immunity. Qualified immunity protects a government official performing discretionary functions from suit in his individual capacity unless the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "The

13

purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, . . . protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotations omitted).

    1.  *Acting within Discretionary Authority*

    To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).  The court turns first to Townsend's Complaint to determine what wrongful acts or omissions of Sheriff Hale and Chief Costa it alleges.  The remaining counts directed at those two defendants are Counts I, III, V, and VIII. While the Complaint is not a model of clarity, the court summarizes the alleged wrongful acts of Hale and Costa as follows: (1) failure to train and supervise Jail personnel regarding obtaining timely and adequate medical care for inmates, in violation of the Fourteenth Amendment (Count I, VIII); (2) failure to implement meaningful policies and procedures to ensure inmate safety and to prohibit an atmosphere that tolerated the staff's deliberate indifference to inmate safety and medical needs, in violation of Fourteenth Amendment (Count I); (3) failure to provide adequate funding for inmates' medical care, including failing to obtain enough funding to hire a doctor and adequate staff to meet medical needs, in violation of the Fourteenth Amendment (Count III); (4) pattern and practice of failing to provide adequate staffing of the Jail, in violation of the Fourteenth Amendment (Count V).

    a.  Failure to Provide Adequate Funding

    Undisputed evidence demonstrates that the Jefferson County Commission – not

14

Defendants Hale or Costa – is responsible under Alabama law for providing adequate funding for inmate or detainee healthcare in the Jail.  *See* Ala. Code § 14-6-19 (1975).  Consequently, a claim against Hale and Costa based on that theory must fail as a matter of law.  To the extent that Count III includes such a claim, the court will DISMISS it.

> b.  Other Alleged Wrongful Acts

With respect to the other wrongful acts alleged, Sheriff Hale and Chief Costa have acted within their discretionary authority if their actions were "undertaken pursuant to the performance of [their] duties" and "within the scope of [their] authority."  *See Gray ex. rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006).  As Sheriff of Jefferson County, Alabama, Sheriff Hale "has the legal custody and charge of the Jail" and the inmates or detainees confined to the Jail, and the Sheriff "may appoint a jailer."  *See* Ala. Code § 14-6-1 (1975).  Sheriff Hale appointed Chief Costa as Chief of Corrections of the Jail and delegated to him the responsibility for its day-to-day operations, and those decisions were made "pursuant to the performance of his duties" and were "within the scope his authority" as Sheriff.  Setting policies for the Jail, training Jail personnel, or delegating to other governmental officials those tasks were also duties that were in the "scope of his authority" as Sheriff.  Accordingly, this court finds that, if Sheriff Hale committed any of the wrongful acts alleged in the Complaint, those acts would fall within his discretionary authority.

In his capacity as Chief of Corrections of the Jail, Chief Costa entrusted his subordinates with the responsibility of directly supervising the deputy sheriffs who worked in the Jail.  The captain, lieutenants, and sergeants reported any issues or problems that arose in the Jail to Chief Costa.  Chief Costa appointed Sergeant Guy as the full-time training sergeant responsible for

assuring that all deputy sheriffs who worked in the Jail were appropriately and adequately trained.  Additionally, any decision on staffing levels in the Jail was within Chief Costa's discretion.  To the extent that the Sheriff delegated the task of setting Jail policies to Costa, that task was also within the scope of his discretionary authority.  Accordingly, this court finds that, if Chief Costa committed any of the wrongful acts alleged in the Complaint, those acts would fall within his discretionary authority.

*2. Plaintiff's Burden:  Two-Part Test*

Once a defendant demonstrates "that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard*, 311 F.3d at 1346.  The Supreme Court has articulated a two-part test to determine whether qualified immunity applies.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The court first asks "' this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . [I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.'" *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (quoting *Saucier*, 533 U.S. at 201).

a.  Violation of a Constitutional Right: Deliberate Indifference to a Serious Medical Need

Plaintiff's Complaint claims that Defendants violated Plaintiff's constitutional right to adequate medical treatment while she was incarcerated in the Jefferson County Jail.  "It is well settled that the 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth  Amendment.'" *McElligott v.*

16

*Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104

(1976)). As Plaintiff was a pre-trial detainee at the time of the events made the basis of this suit,

the Fourteenth Amendment applies instead of the Eighth Amendment.  *See Bell v. Wolfish*, 441

U.S. 520, 521 (1979); *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539 n.3 (11th Cir.

1994) (*en banc*).   The Eleventh Circuit has held, however, that "in regard to providing pretrial

detainees with such basic necessities as food, living space, and medical care the minimum

standard allowed by the due process clause is the same as that allowed by the eighth amendment

for convicted persons."  *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1396 (11th Cir. 1994); *see*

*Tittle*, 10 F.3d at 1539 (noting "[w]hether the alleged violation is reviewed under the Eighth or

Fourteenth Amendment is immaterial").  Because many of the cases addressing the issue of

inadequate medical care in jail or prison couch that analysis in the context of the Eighth

Amendment, the court will use the Eighth Amendment standard in its own analysis.

    To establish a violation of her constitutional rights under this theory, Townsend must

show that Sheriff Hale and Chief Costa demonstrated "deliberate indifference to [her] serious

medical needs."  *Estelle,* 429 U.S. at 106.  In the Eleventh Circuit, "'[i]t is well established . .

.that supervisory officials are not liable under § 1983 for the unconstitutional acts of their

subordinates on the basis of *respondeat superior* or vicarious liability.'"  *West v. Tillman*, 496

F.3d 1321, 1328 (11th Cir. 2007) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.

2003)). Sheriff Hale and Chief Costa were not present at the Jail on September 24, 2004 and had

no contact with Townsend; indeed, Townsend does not allege that they personally participated in

any alleged constitutional deprivation.

    In circumstances where a plaintiff does not allege personal participation on the part of the

17

supervisor, the plaintiff must establish a causal connection between the actions or inactions of the supervisor and the alleged constitutional deprivation.  *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999); *see also Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Specifically,

> [a] causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; [or] 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (emphasis added) (quoting *Cottone*, 326 F.3d at 1360).

In her Complaint, Townsend alleges that Sheriff Hale and Chief Costa violated Townsend's constitutional rights by failing to train Jail personnel regarding inmate medical needs; enacting faulty policies regarding responding to inmate medical needs; and failing to adequately staff the Jail.   The court will examine each of these allegations to determine whether Plaintiff has established a causal connection.  Plaintiff has not demonstrated a causal connection through the first and third methods set out in *Valdes* and quoted above; she has provided no evidence supporting a history of widespread abuse in the Jail and no facts supporting an inference that Hale or Costa either directed subordinates to act unlawfully or knew subordinates would act unlawfully, yet failed to stop them.  Accordingly, the court will focus on the remaining means of establishing a causal connection: deliberate indifference.

(1) Failing to Train Jail Personnel to Respond to Inmates' Serious Medical Needs

18

Townsend alleges that Sheriff Hale and Chief Costa violated her constitutional rights by failing to train Jail personnel "regarding obtaining timely and adequate medical care for inmates' needs" or otherwise "failing to train or supervise those charged with caring for the inmates in their custody" (Pl's Compl. ¶¶ 18, 41).  When addressing failure to train claims, the Eleventh Circuit Court of Appeals has held that

> [a] supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his "failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact" and the failure has actually caused the injury of which the plaintiff complains.

*Belcher,* 30 F.3d at 1397 (quoting *Popham v. City of Talladega*, 908 F.2d 1461, 1564-65 (11th Cir. 1990)) (emphasis added).  "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, ... and when the failure to train is likely to result in the violation of a constitutional right."  *Id.* at 1397-98.

In the instant case, the evidence indicates that the deputies did indeed receive training; the Jail provides deputies with a preliminary six to eight week training course, monthly in-house training, and annual APOST[3] training.  The testimonies of Sergeant Guy and the deputies on call, Deputy Daniels and Deputy Chambers, are consistent.  They all agree that the deputies working on September 24, 2004 participated in a variety of training programs.  They testified that they were trained to identify situations when a medical emergency existed, and in those situations to call a "Code White" and contact medical personnel.  They were also trained to notify medical personnel when an inmate complained of medical problems that did not appear to be an

---

[3]The acronym stands for "Alabama Peace Officers Standards and Training."

19

emergency.  While deputies are trained to contact medical personnel instead of treating the

patients themselves, medical personnel from MHCA work in the Jail and are available twenty-

four hours a day.  Townsend has identified no case law indicating that the U.S. Constitution

requires that all deputies undergo medical training under those circumstances.  Similarly,

Townsend has identified no case law indicating that training Jail subordinates to refer medical

emergencies to in-house medical personnel is constitutionally inadequate.  Indeed, in her

response to Hale and Costa's Undisputed Material Fact 8, Townsend admitted that "Deputies

Chambers and Daniels received adequate training. . . ."  In light of the evidence presented,

Townsend's true objection appears to be *not* that the deputies received inadequate training but

rather, that they responded to Townsend's situation contrary to their training.  If so, Hale and

Costa cannot be liable for their actions under a "failure to train" theory.

However, assuming *arguendo* that Hale and Costa failed to adequately train the deputies

in question, Townsend must still establish that the failure to train amounted to deliberate

indifference.  She may do so by proving that "the need for more or different training is obvious."

*Belcher*, 30 F.3d at 1397-98.   A history of prior problems with Jail deputies who failed to

recognize medical emergencies, who inappropriately refused to refer inmates to medical

personnel, or who inappropriately delayed doing so may have placed Defendants Hale and Costa

on notice of a need for more or different training.  Yet, no evidence exists on the record of any

such incident of inadequate medical response at the Jail prior to Townsend's miscarriage;

Townsend has pointed this court to no previous problem with medical care at the Jail.  Hale and

Costa testified that, prior to the incident involving Townsend,  neither of them received

notification of a need for more or different training of deputies in responding to medical

20

emergencies.  When the only incident of alleged deliberate indifference to a medical need is the incident made the basis of the suit, with no prior incidents to put Jail officials on notice of a duty for more or different training, the evidence is insufficient to establish liability for failure to train. *See Williams v. Limestone County*, 2006 WL 2805636, *3 (11th Cir. October 2, 2006) (finding that plaintiff's citation only of the incident involving himself is insufficient to support sheriff's liability for failure to train staff) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808 (1985)). Accordingly, Townsend has failed to show a pattern of healthcare problems at the Jail that put officials on notice of the need for training and rise to the level of constitutional violations.

Plaintiff has not demonstrated that Hale and Costa's failure to provide more or different training to their deputies constituted deliberate indifference.  Accordingly, the court will GRANT summary judgment as to the claim that their failure to train deputies constituted deliberate indifference.

The court acknowledges Townsend's argument that Hale and Costa are also responsible for supervising and training Nurse Langston.  However, the evidence clearly shows that Nurse Langston is neither an employee of Jefferson County nor the Office of Sheriff, but rather is an employee of MHCA supervised by Cooper Green Hospital representatives. Townsend's admissions of fact are confusing at best.  She admits that neither Hale nor Costa trained or supervised Nurse Langston in response to "Undisputed Material Fact" 2 and 3.  In response to "Undisputed Material Fact" 5, however, she asserts that the sheriff's office supervised medical personnel when they are working at the jail.  In support of her assertion, she cites Jail Division

General Order 4-2, which purportedly guides deputies responding to medical emergencies.[4]  The court finds, however, that neither this Order nor any other evidence of record supports Townsend's assertion that Hale or Costa was responsible for training and/or supervising Nurse Langston *in providing healthcare* to inmates or detainees.  Further, "[t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong."  *Thomas v. Campbell*, 2006 WL 1600525, *4 (M.D. Ala. 2006) (citing *Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977)).

Given the training program in place at the Jail – which training included policies and customs that required deputies to contact Jail medical personnel –  and given Townsend's admission that the training was adequate, the court finds that Townsend has failed to establish Hale and Costa's deliberate indifference as a matter of law.  Even assuming *arguendo* that she had established their deliberate indifference, she has presented no evidence that their failure to train *caused* her injuries.  Accordingly, this court finds that Townsend has failed to produce

---

[4]General Order 4-2 is entitled "Medical Emergencies," is dated January 1, 2000 (before the contract with MHCA), and provides in relevant part: "**Policy:** Emergency medical services are available twenty-four (24) hours a day to inmates of the [Jail] to ensure prompt emergency medical attention.  All officers are trained to respond to medical emergencies since an inmate's life may depend upon quick action.  **Procedure:** Emergency Definition Any of the following occurrences shall constitute an emergency and their presence will [sic] considered a medical emergency: A.  Severe bleeding, . . .F. Severe pain, . . . I. Health or Life threatening situation.  **Notification** The deputy confronted with a medical emergency will: A.  Immediately notify the Shift Supervisor on duty and request assistance in administering first aid, B. Request the central control officer to call the facility medical staff and relay the emergency information.  **Note:** *If the medical staff is not available, the appropriate emergency medical services shall be contacted.*  **Within the Facility**   When there is a medical emergency, the deputy will notify Central Control immediately, Central Control will notify the Medical Department immediately and tell the medical staff the precise location and the inmate's name.  If no one is available in the Medical Department, the central control officer [sic] and will have the medical staff person on duty located. . . . Following the assessment by the medical staff personnel, the inmate may require immediate transfer to Cooper Green Emergency Department . . . ."

evidence on her "failure to train" claim supporting deliberate indifference on the part of Hale and

Costa or supporting a causal connection between a failure to adequately train and Townsend's

injury.  Without establishing deliberate indifference, Plaintiff has not established a violation of

her constitutional rights, and the court need not proceed further with an analysis of qualified

immunity.   This court will GRANT Hale and Costa's motion for summary judgment on the

failure to train claim and will DISMISS Counts I and VIII to the extent that those counts state a

failure-to-train claim.

(2) Enacting Faulty Policies and Customs

To impose liability upon Sheriff Hale and Chief Costa based upon a policy or custom

argument, Townsend must demonstrate: "(1) that [her] constitutional rights were violated; (2)

that the [policymaker] had a custom or policy that constituted deliberate indifference to that

constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*,

392 F.3d 1283, 1289 (11th Cir. 2004).  Assuming *arguendo* that Townsend can prove that Hale

and Costa's subordinates acted with deliberate indifference to her serious medical need and, thus,

violated her Fourteenth Amendment right to due process, Townsend must still prove elements

two and three to succeed under this theory.

To determine what custom or policy is faulty, the court turns to Townsend's Complaint.

The Complaint alleges in part:

> Sheriff Hale, and Costa have created an atmosphere of tolerance regarding
> neglectful and wanton behavior on the part of Jefferson County Deputy
> guards and those with whom they are charged with the care and custody of
> the inmates in the Jefferson County Jail. . . .The conditions as they existed in
> the Jefferson County Jail such as the . . . tolerating the guards (sic)
> indifference to the legitimate and life threatening complaints of inmates with
> regard to Townsend and others as set out herein above, have allowed

23

Defendants Chambers, Daniels and Langston to act in a manner that fails to meet contemporary standards of decency, causing needless and wanton infliction of pain and suffering, and are not reasonably or rationally related to any government objectives. ( Count One, ¶ 18)

Defendants. . . Hale and Costa violated Plaintiff's constitutionally protected rights under the . . . Fourteenth Amendment and were deliberately indifferent to the serious medical needs of their inmates arising from the failure to provide for a jail physician . . . .(Count V, ¶ 25)

Defendants . . .Hale, and Costa violated Plaintiff's . . . Fourteenth Amendment protected rights by establishing a pattern and practice of failing to provide adequate staffing in the jail. . . . During the majority of the time the Plaintiff was suffering pain and severe bleeding there was only one guard on duty who was ignoring the pleas of the Plaintiff.  Further, that guard was restricted to the guard desk and unable to check on the inmates because of her "condition." . . . . Defendants' lack of adequate staffing proximately caused the Plaintiff's cries for help to go unanswered and as a result Plaintiff was forced to endure hours of pain and suffering while losing her unborn child. (Count V, ¶ 32).

In their brief, Hale and Costa note that the Complaint is not a paragon of clarity as they struggle to identify what customs, procedures, or policies Townsend is challenging.  While a lack of clarity in Complaints always represents a problem to defendants, who must respond to the allegations, it can represent a problem for the court in cases where qualified immunity has been invoked.   Using its best efforts to decipher Townsend's Complaint, the court finds that she has attempted to identify two customs or policies of the Jail that allegedly violated her constitutional rights: (1) a policy of inadequate staffing of the Jail, including the failure to provide a Jail physician, and the failure to provide at least two guards on each floor at all times who may have contact with inmates and respond to their needs; and (2) a policy of tolerating the guards' neglect of inmates' medical needs.  The court will address each allegation separately.

2 (a).  Policy of Inadequate Staffing

24

The first staffing inadequacy that Townsend identifies is the lack of a Jail physician. The record includes no evidence that the Jail did or did not have a physician or did not have a physician on September 24, 2004. The record includes no evidence that if the Jail did not have a physician on staff, it was not providing adequate healthcare to inmates. The record does reflect that the Jail did have a medical clinic on site with nurses staffing the clinic who could refer inmates to physicians and/or the hospital for further treatment. The record includes no evidence of prior medical emergencies at the Jail that placed Hale and Costa on notice of the need for a Jail physician. The record includes no evidence that the delay in responding to Townsend was related in any way to the lack of a physician at the Jail. Put another way, the record includes no evidence that the lack of a physician on staff at the Jail on September 24, 2004 caused Townsend's injuries, pain, or miscarriage. Further, Townsend points the court to no law stating that failing to employ a Jail physician constitutes deliberate indifference to the health of inmates.

In any case, the record does not reflect that Hale and Costa, who are not medical professionals, make decisions regarding the staffing of *medical* personnel at the Jail. It does, however, include the affidavits of Hale and Costa testifying that Jefferson County awarded MHCA the responsibility for providing healthcare to inmates of Jefferson County Jails and that agents of MHCA and/or Jefferson County d/b/a Cooper Green Hospital and/or Jefferson Health System determined the appropriate staffing levels for the *medical* personnel in the Jail, not Hale or Costa. (doc. 79, Ex..2, 3, 4, 5).

The second staffing inadequacy that Townsend identifies is the policy of having less than two guards available on each floor of the Jail at all times to respond to inmates needs. Yet, the evidence is undisputed that the Jail policy does indeed require that two deputy sheriffs work on

each level of the Jail at all times. (doc. 79, Ex. 3 at 3; Ex. 9, at 29).  If on September 24, 2004,

only one deputy was working on Level 5 of the Jail, that staffing was contrary to policy, not the

result of a faulty one.  The court notes that the evidence regarding staffing on September 24,

2004 supports rather than contradicts the existence and enforcement of a two-guard-per-floor

policy.  When Sergeant McClinton determined that the evening shift of level five would be short

one deputy, he asked Deputy Chambers to work the evening shift on that level to ensure that two

deputies were present.  (doc. 79, Ex. 9, at 23).  The records do reflect, however, that although

Deputy Daniels was present on level five for the entire evening shift from 2:00 p.m. to 10:00

p.m., Deputy Chambers arrived on the floor about an hour and fifteen minutes late for the shift

and left about a half-hour early before the end of the shift.[5]  (doc. 79, Ex. 9, at 20, 49, & Att. 2).

The records also reflect that another deputy came from another floor to help Daniels do the head

count at the beginning of the shift, but that Daniels was alone on level five when that deputy left

the floor until Chambers arrived at 3:15 p.m. and then she was alone again from 9:30 p.m. to

10:00 p.m.

      Accordingly, the evidence does reflect a variance in the two-deputy-on-the-floor policy

on September 24, 2004 at the beginning and end of the shift.  However, Townsend cannot hold

Hale and Costa responsible for this temporary failure to adhere to the policy when they were not

present at the Jail at the time, and without evidence that the failure to adhere to the policy was a

persistent and widespread practice." *See McDowell,* 392 F.3d at 1290.  "Regardless whether the

basis of the claim is an officially promulgated policy or an unofficially adopted custom, it must

---

[5] The records also reflect that Deputy Chambers temporarily left Level 5 during the shift hours four times to perform routine duties such as to transport  inmates to another floor. (doc. 77, Ex. 7, p. 36-38)

be the 'moving force behind the constitutional deprivation before liability may attach.'"

*Fundiller v. City of Cooper City,* 777 F.2d 1436, 1442 (11th Cir. 1985) (quoting *City of Okla. City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2434, 83 L.Ed.2d 791 (1985)).  The Eleventh Circuit has defined a "custom" as "' a practice that is so settled and permanent that it takes on the force of law.'" *McDowell*, 392 F.3d at 1290 (quoting *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999)).  Thus, isolated incidents are insufficient to establish a policy or custom.  *Id.*

In the instant case, Townsend has offered no evidence that the two-deputies-per-floor policy was routinely breached or indeed that less than two guards worked on each floor at the Jail on any occasion other than September 24, 2004.  Hale testified in his affidavit: "At no time before or after the filing of the [Townsend lawsuit] have I been apprised of a failure to adequately staff the Jefferson County Jails."  (doc. 79 Ex. 2).  Similarly, Costa testified in his affidavit:

> It was the custom of the Office of Sheriff of Jefferson County that two deputy sheriffs work on each level of the Jail . . . .As a result of the nature of the environment in a correctional institution, adequate staffing was imperative and it was of utmost importance that the Jail was adequately staffed at all times.  If an issue arose where it appeared a floor was going to be short for a particular shift, my staff and I did what was necessary to insure that adequate correctional personnel and staff were present in the Jail.  At no time during my tenure as the Chief of Corrections of the Jail was I ever notified, informed or apprised of an inadequate staffing issue in the Jail that lead [sic] and/or caused harm to the inmates in the Jail.

(doc. 79, Ex. 3).  Townsend offered no evidence to rebut the testimony of Hale and Costa. Accordingly, Townsend has not demonstrated that the Jail had a custom or practice of breaching its two-deputies-per-floor policy.

Townsend argues, however, that the policy of restricting pregnant deputies to the control room and forbidding their contact with inmates resulted in inadequate staffing on September 24,

2004 and inadequate medical care to Townsend.  She claims that because Deputy Chambers was pregnant, restricted to the control room, and unable to respond personally to Townsend's calls for help, Townsend did not receive medical care in time to avoid a miscarriage.  However, this argument is misfocused.

Pursuant to Jail policy, pregnant deputies are not permitted to have direct inmate contact. (doc. 79, Ex. 7, at 33).   Also pursuant to Jail policy, deputies manning the control room are not allowed to have direct inmate contact unless a second deputy takes over control room duties; one deputy must remain in the control room at all times.  (doc. 79, Ex. 3).  Accordingly, deputies who are pregnant on Level 5 are placed in the control room, where they are able to perform all control room duties and have no direct contact with inmates.  On occasion, a deputy manning the control room will be temporarily alone on the level when, for example, the other deputy is transporting an inmate to another level.  If an emergency occurs while a deputy is in the control room and temporarily alone on a Jail level, that deputy – whether pregnant or not – must remain in the control room but would respond to the emergency by calling the appropriate "Code."  (doc. 79, Ex. 3, at 3-4; Ex. 7, at 38-39).  Jail personnel from other floors would then respond.  (doc. 79, Ex. 3, at 3-4).

Accordingly, Daniels' pregnancy was irrelevant to her ability to respond directly to Townsend's or Langston's calls on September 24, 2004; regardless of whether she was pregnant, she could not respond directly because she was manning the control room.  The barrier to Townsend's receiving an immediate, direct, and personal response to Townsend's intercom call was *not* the policy prohibiting a pregnant deputy from having direct inmate contact. Townsend's claims against Hale and Costa for faulty policies must fail.

28

2 (b).  Policy of Tolerating the Guards' Neglect of Inmates' Medical Needs

The court finds that Townsend has failed to allege any claim for faulty policies *other than* the failure to properly train Jail personnel in responding to medical procedures and the failure to provide adequate staffing of medical personnel and deputies, as discussed above.  Townsend has offered no evidence of a history of Jail guards' neglect of inmates' medical needs and has offered no evidence of knowledge on the part of Hale or Costa that Jail guards had previously neglected inmates' medical needs.  To the extent Count One attempts to allege a claim for any other faulty policy, the court will DISMISS that claim.

Having found that Townsend has failed to demonstrate that Hale or Costa instituted Jail policies that constituted deliberate indifference to her constitutional rights, the court will GRANT Hale and Costa's motion for summary judgment as to that claim; the court will DISMISS Counts I, III, and V to the extent that those counts state a claim against Hale and Costa for enacting customs and policies that represent deliberate indifference to Townsend's constitutional rights.

Because no claims remain against Hale and Costa in Counts I, III, V, and VIII, the court will DISMISS Hale and Costa as Defendants to this lawsuit and enter summary judgment in their favor.

**B.  Deputies Chambers and Daniels**

Townsend asserts claims under 42 U.S.C. § 1983 against Deputies Chambers and Daniels, alleging that they  violated her Fourteenth Amendment rights in three ways: (1) by acting with deliberate indifference to her serious medical needs (Count II); (2) by failing to provide medical treatment (Count IV); and by failing to intervene when she requested help and

29

when Nurse Langston and other deputies failed to administer proper medical treatment or notify the proper officials (Count VI).   The court has carefully read Counts II and IV in conjunction with each other and finds that Count IV contains no claims different than those contained in Count II.  Accordingly, the court will DISMISS Count IV of the Complaint as duplicative. Because the remaining claims against the deputies in Counts II and VI both fall under a "deliberate indifference" analysis, the court will address those claims together.

### 1. Acting within their Discretionary Authority

Because the deputies are government officials sued in their individual capacity, they invoke the protection of qualified immunity.   To determine whether Deputies Chambers and Daniels are entitled to the protection that they seek under qualified immunity, the court first must analyze whether they were acting "within the scope of [their] discretionary authority when the allegedly wrongful acts occurred." *Vinyard,* 311 F.3d at 1346.  Deputies Chambers and Daniels acted within their discretionary authority if their actions were "undertaken pursuant to the performance of [their] duties" and "within the scope of [their] authority." *Gray ex. rel. Alexander,* 458 F.3d at 1303.  The actions or inactions identified revolve around the deputies allegedly inappropriate response to Townsend's complaints of pain, vomiting, and bleeding.  The court finds that responding to an inmates' complaints fall within the deputies' discretionary authority, as that term is defined for qualified immunity purposes.

### 2. Plaintiff's Burden:  Two-Part Test

Because the deputies have demonstrated that they were acting within their discretionary authority, the burden shifts to Townsend to show that qualified immunity is not appropriate. *See Vinyard*, 311 F.3d at 1346.   As the court discussed previously, it must now apply a two-part test

30

to determine whether Townsend has met that burden.  *See Saucier v. Katz*, 533 U.S. at 201.

Part 1:  Violation of a Constitutional Right/Deliberate Indifference to a Serious
Medical Need

As noted, Townsend claims that Deputies Chambers and Daniels failed to seek and secure immediate medical attention for her when she complained of "extreme abdominal pain and bleeding." (Pl.'s Compl. ¶ 22).  She also claims that the deputies "failed to intervene when Nurse Langston and the other deputies refused to administer the proper medical treatment."  (Pl.'s Compl. ¶ 35).   To succeed in her claim that their failures constitute a constitutional violation, Townsend must prove that her "inadequate care arose from a 'deliberate indifference to [her] serious medical needs.'" *See Williams v. Limestone County, Ala.*, 198 Fed. App'x 893, 896 (11th Cir. 2006) (quoting *Estelle*, 429 U.S. at 291).  Unlike Hale and Costa, Deputies Chambers and Daniels were present at the Jail and worked at Level 5 on September 24, 2004, the date of the incident made the basis of this suit; accordingly, their actions or inactions in responding to Townsend take center stage of the court's analysis.

In these circumstances, to prove deliberate indifference, an inmate "must shoulder three burdens." *Goebert v. Lee* County, 510 F.3d 1312, 1326 (11th Cir. 2007).  The first component is an objective one: Townsend must prove that she had a serious medical need, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotation and citation omitted).

Townsend presents no evidence that she had received a physician's diagnosis of a serious medical need when she was at the Jail or before she entered the hospital late on the evening of

31

September 24, 2004.  Accordingly, she must demonstrate that her need was so obvious that even a lay person would recognize its seriousness.   In hindsight, Townsend's need was very serious indeed; by 10:13 p.m. of the evening of September 24, 2004, she had suffered a miscarriage. However, the deputies did not have the benefit of hindsight when she complained of medical problems.  The testimony of the Deputies, Nurse Langston, and witnesses present the court with facts that vary widely regarding Townsend's symptoms, her demeanor, and the content of her complaints.  Nevertheless, if the court is to accept her version of events – which it must do  for the purposes of this motion – Townsend was pregnant, in severe pain, vomiting, and bleeding. Accordingly, the court finds that Townsend has presented sufficient evidence to establish a genuine issue of material fact that her need for medical treatment was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *See id.*

The second component that Townsend must show is that the Deputies acted with deliberate indifference to that need.  To establish deliberate indifference, Townsend must prove: "(1) subjective knowledge of a risk of a serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).   "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Goebert,* 510 F.3d at 1327 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

As noted, in the instant case, the facts on the record from which the court can infer subjective knowledge – facts about what the deputies saw, heard, or experienced – vary widely

32

depending upon whose testimony is accepted.  The deputies argue that they did not see any

blood, that Townsend was not doubled over in pain or otherwise exhibiting signs of severe pain,

and that they did not know Townsend faced a substantial risk of harm.  They may well be able to

convince a jury that they were not subjectively aware of any substantial risk of harm.

Once again, however,  the court must accept Townsend's version at this juncture.

According to her version of events, the deputies heard repeated requests for medical help from

Townsend and other inmates over a period of hours – the timing varying between three and over

eight[6] hours –  that she was experiencing abdominal pain, vomiting, and bleeding or "spotting."

Townsend claims that she and her cell mates pushed the intercom at least ten times to relay

complaints and update the deputies on her condition.  (doc. 77, Ex. 1, p. 67).   They claim that

both deputies were rude and dismissive of their complaints, with Chambers talking to Townsend

in a "crappy" way about her pregnancy and Daniels cussing at Townsend and her cellmates when

they repeatedly called on the intercom.   The evidence is undisputed that both deputies knew

Townsend was pregnant.  Given these circumstances, a jury could conclude that Deputies

Chambers and Daniels were aware that Townsend was in severe pain and vitally in need of

medical treatment, and yet they disregarded that need.

The deputies argue that after receiving Townsend's initial requests for help, they referred

her to Nurse Langston, relied on the nurse's professional healthcare expertise, and *had no duty to

intervene* in Townsend's medical care.  The deputies are correct in arguing that "[t]he law does

not impose upon correctional officials the duty to . . . intervene in treatment decisions *where they*

---

[6]Although Townsend testifies that she began having problems about 10:00 a.m. and began notifying the
Deputies at that point (doc. 77, Ex. 1, p. 58), she also admits in responding to "undisputed facts" that Deputy Daniels
did not begin her shift until 2:00 p.m. and Deputy Chambers did not arrive on Level 5 until after 3:00 p.m.

*have no actual knowledge* that intervention is necessary to prevent a constitutional wrong." *See Fretwell v. Deese*, 2006 WL 2080022, at \*6 (M.D. Ala. July 25, 2006) (emphasis added) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)).  The Third Circuit Court of Appeals has explained:

> If a prisoner is under the care of medical experts [,] . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. . . .
>
> Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the . . . requirement of deliberate indifference.

*Spruill*, 372 F.3d at 236.

Although the evidence does show that the deputies directed Townsend to see Nurse Langston, who came to Level 5 of the Jail that night to distribute pills, further evidence indicates that both deputies knew that Nurse Langston did not provide any immediate care for Townsend at that point; the deputies heard Nurse Langston tell Townsend that she would have to wait until after the nurse finished distributing pills.  (doc. 77, Ex. 5, 32; Ex. 7, 61).  The pill distribution process requires an hour and a half to two hours.  (doc. 77, Ex. 14, 26).  After being told that she would have to wait to receive care, Townsend testified that she returned to her cell and then called the deputies over the intercom "several" more times, requesting help. (doc. 77, Ex. 1, 72).  When they received these later calls, then, the deputies  knew that she had *not* received treatment from the medical expert.

The instant case is not a situation in which a nurse provided medical treatment, and the prison officials did not have the medical expertise to evaluate the appropriateness of that

34

treatment.  It is a situation in which no medical treatment was given, and the deputies were aware

that no treatment had been given.  According to Townsend, after she returned to her cell from

talking with Langston, she and her cell mates continued to make intercom calls for help, updating

the deputies on Townsend's worsening condition, including bleeding and pain.  Given these

circumstances, Townsend has presented a genuine issue of material fact as to whether Deputies

Chambers and Daniels were aware that Townsend was vitally in need of medical treatment.

Further, she has presented uncontroverted evidence that the deputies were aware Nurse Langston

was not yet providing any medical treatment and was not planning to do so for at least an hour

and a half.  Given this evidence, Townsend has presented a genuine issue of material fact as to

whether the deputies disregarded Townsend's serious medical need.  In this same vein, she has

presented a genuine issue of material fact as to whether the deputies failed to intervene when they

knew Townsend's serious medical need and knew neither Nurse Langston nor any other Jail

personnel were addressing it.

The harder question is whether the evidence supports a finding that the deputies' conduct

was more than mere negligence.    The Eleventh Circuit provided the following guidance on this

issue:

> Our cases have given substance to *Estelle's* distinction between "deliberate
> indifference" and mere negligence, explicating categories of action or
> inaction that may constitute deliberate indifference.  We have repeatedly
> found that "an official acts with deliberate indifference when he or she
> knows that an inmate is in serious need of medical care, but he fails or
> refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe*
> *County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *Mandel v. Doe*, 888
> F.2d 783, 788 (11th Cir. 1989) (noting that "knowledge of the need for
> medical care and intentional refusal to provide that care constitute deliberate
> indifference").  Even where medical care is ultimately provided, a prison
> official may nonetheless act with deliberate indifference by delaying the

> treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.  *See Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Brown v. Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990).  We have also held that deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment.  *See Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).  Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel*, 888 F.2d at 789; *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

*McElligott*, 182 F.3d at 1255.  As the court has repeatedly noted, the disputed facts form varying pictures of Townsend's condition and demeanor when she complained to the deputies before the miscarriage.  The deputies' arguments, many of which appear plausible, would require the court to make inappropriate factual findings; that task is reserved for the jury.  Depending on which facts the jury accepts, the deputies' actions could be characterized as not negligent at all, mere negligence, or deliberate indifference.  However, this court must accept as true all Townsend's factual allegations and draw all reasonable inferences in her favor; given that obligation, the court concludes that sufficient evidence exists to create a genuine issue of material fact as to whether Deputies Chambers and Daniels were deliberately indifferent to Townsend's serious medical needs.

In addition to proving a serious medical need and the deliberate indifference to that need, Townsend must also shoulder one more burden: she must prove that the deputies' deliberate indifference *caused* her alleged injury.  *See Goebert*, 510 F.3d at 1326.  The deputies argue that Townsend has provided no expert testimony that the deputies' failure to provide or delay in providing medical treatment caused her miscarriage and, therefore, she fails to meet her

36

causation burden. *See Williams v. South Fulton Regional Jail,* 152 Fed. App'x 862, 864 (11th Cir. 2005). Townsend has indeed failed to provide medical records, doctor testimony, or other evidence other than her own testimony that the delay in treatment caused her miscarriage. Absence of expert testimony dooms this claim, at least to the extent that she claims the delay caused the miscarriage. *Id.* However, the deputies are incorrect if they assume that Townsend's only possible injury was the miscarriage of her baby. Townsend also alleges pain as a result of the deputies' refusal to obtain treatment for her or delay in obtaining treatment for her. Townsend claims that she was in severe pain for hours on September 24, 2004 and, because of her nearly constant complaints to the deputies, she claims that they were aware of her suffering, yet failed to do anything about it until she miscarried her baby.

The Eleventh Circuit has "recognized that prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain." *McElligott*, 182 F.3d at 1257. In *McElligott*, the Court of Appeals reversed the district court's granting of summary judgment in favor of the doctor and nurse, finding that sufficient evidence existed for a jury to find that they were deliberately indifferent to the inmates' "need for further diagnosis of and treatment for the severe pain he was experiencing." *Id.* While they did not hold the doctor and nurse liable for failing to diagnose the inmate's colon cancer, they did find that a jury could hold them liable for failing to respond to his pain:

> Despite the repeated complaints about the pain he was suffering from, a jury could find that [the doctor and nurse at the jail] basically did nothing to alleviate that pain, essentially letting [the inmate] suffer even as his condition was deteriorating.

*Id.*

37

Similarly, the Eleventh Circuit has found that even a few hours of delay in treating an inmate's painful injury could represent an act of deliberate indifference under the Eighth Amendment. *See, e.g., Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990). In *Brown*, prison official delayed a few hours before treating the pain emanating from an inmates' broken foot. The Court of Appeals found a constitutionally cognizable injury, noting

> [w]ith this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves. Deliberately inflicted pain, as with an electric cattle prod, does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary.

*Id.*

Although Townsend may not testify that the deputies' failure to provide or delay in providing medical treatment caused her miscarriage, she may present evidence that they intentionally failed to treat her pain. Accordingly, the court finds that, because fact questions abound, Townsend has met her burden of providing evidence of the deputies' deliberate indifference to her serious medical need that caused a constitutionally cognizable injury. Thus, based on the evidence presented, Townsend raises a genuine issue of material fact as to whether the deputies violated her Fourteenth Amendment right to receive medical treatment for her pain.

Part Two: Was the Constitutional Right Clearly Established?

Even if the deputies violated Townsend's constitutional rights, they "may nevertheless be shielded from liability for their constitutionally impermissible conduct if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *See Hope*, 536 U.S. at 731 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)).  The purpose of the "clearly established law" requirement is to provide government

officials with fair notice of potential liability; "[o]fficers sued in a § 1983 civil action have the

same fair notice right as do defendants charged under 18 U.S.C. § 242, which makes it a crime for

a state official to act willfully and under color of law to deprive a person of constitutional rights."

*Hope*, 536 U.S. at 731.  As the Eleventh Circuit has explained:

> Qualified immunity is a guarantee of fair warning.  Under the doctrine
> of qualified immunity, a government official sued for damages for
> injuries arising out of the performance of discretionary functions must
> be "shown to have violated 'clearly established statutory or
> constitutional rights of which a reasonable person would have known.'"
> *Conn* [ *v. Gabert*, 526 U.S. 286,], 119 S.Ct. [1292,] 1295 [1999]
> (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73
> L.Ed.2d 396 (1982)).  As the Supreme Court has explained, "qualified
> immunity seeks to ensure that defendants 'reasonably can anticipate
> when their conduct may give rise to liability,' by attaching liability only
> if '[t]he contours of the right [violated are ] sufficiently clear that a
> reasonable official would understand that what he is doing violates that
> right.'' *United States v, Lanier*, 520 U.S. 259, 270, 117 S.Ct. 1219, 137
> L.Ed.2d 432 (1997) (citations omitted).  "This is not to say that an
> official action is protected by qualified immunity unless the very action
> in question has been held unlawful; but it is to say that in the light of
> preexisting law the unlawfulness must be apparent."  *Anderson v.
> Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034,  97 L.Ed. 2d 523 (1987)
> (citations omitted).

*McElligott*, 182 F.3d at 1260.  The Supreme Court has held that "officials can be on notice that

their conduct violates established law even in novel factual situations. . . .Accordingly, the

salient question . . .is whether the state of the law [at the time of the incident in question] gave

respondents fair warning that [plaintiff's] alleged treatment was unconstitutional."  *Hope*, 536

U.S. at 731.

       In the instant case, this standard has been met.  On September 24, 2004, the date of the

alleged constitutional violations made the basis of this suit, the law was clearly established that

prison officials' "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment." *See Estelle*, 429 U.S. at 104 (internal citation omitted). Whether the deputies were aware that Townsend was in substantial danger of having a miscarriage, the facts viewed in the light most favorable to Townsend would nevertheless raise a genuine issue of material fact as to whether they were aware she was in a lot of pain. On September 24, 2004, the law was clearly established that deliberately failing to treat an inmate's pain violated the Eighth Amendment. *See id.* at 103; *McElligott*, 182 F.3d at 1257. Further, the law was clearly established that deliberately delaying the treatment of pain – even for a few hours – was a constitutionally cognizable injury. *See Estelle,* 429 U.S. at 104; *McElligott*, 182 F.3d at 1257; *Brown*, 894 F.2d at 1538.

Accordingly, Townsend has met her burden of showing under the Supreme Court's two-part test that, when the facts are viewed in the light most favorable to her, the deputies violated her clearly-established constitutional rights. Therefore, they are not entitled to qualified immunity from suit, and they are not entitled to summary judgment as a matter of law. The suit against them may go forward as to Count II and VI. Therefore, the court will DENY the Motion for Summary Judgment of Chambers and Daniels with respect to Count II's claims that they exhibited deliberate indifference to the serious medical needs of Sherika Townsend. Further, the court will DENY the Motion for Summary Judgment of Chambers and Daniels with respect to Count VI's claims that they exhibited deliberate indifference in failing to intervene when she requested help and when Nurse Langston and other deputies failed to administer proper medical treatment or notify the proper officials. As noted earlier, because Count IV is duplicative of

40

Count II, the court will DISMISS Count IV as to Deputies Chambers and Daniels.

### C.  Nurse Langston

Townsend asserts claims under 42 U.S.C. § 1983 against Defendant Langston, alleging that she violated Townsend's Fourteenth Amendment rights through deliberate indifference to Townsend's serious medical needs.  As noted previously, because the court finds that Count IV is duplicative of Count II, it will DISMISS Count IV as to the remaining Defendant that it names:  Nurse Langston.

Because Langston does not raise qualified immunity as a defense, the court will proceed to a "deliberate indifference" analysis.  Townsend argues that sufficient evidence exists in the summary judgment record to create a genuine issue of material fact as to whether Nurse Langston, despite knowing of a substantial risk of harm to Townsend, was deliberately indifferent to her serious medical needs.  The court agrees.

As discussed previously, Townsend has a three-fold burden.  Her first burden is provide sufficient evidence for a jury to find an objectively serious need, which she has provided.  The second burden is to establish that Langston acted with deliberate indifference to that need.  Once again, to establish deliberate indifference, Townsend must prove: "(1) subjective knowledge of a risk of a serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d at 1351.

The record shows that, regardless of when the deputies learned of Townsend's medical problems,  Langston first learned of her complaints at pill distribution on F-Block sometime after 7:30 p.m.   Both of Townsend's roommates went to the slider door and told the nurse that Townsend was bleeding and having abdominal pain.  Deputy Daniels had also relayed to the

nurse via the intercom that Townsend was having pain and bleeding and needed to see her. Finally, Townsend herself came to the slider and advised Langston that she was pregnant, bleeding, and having stomach pain.   Accordingly, Langston certainly had a subjective awareness that Townsend was having some medical issues.

Langston claims that, although she was aware of Townsend's complaints and understood that Townsend would eventually need further examination and possible treatment, she made a professional judgment call that Townsend's condition did not represent an emergency situation. Therefore, she delayed examination and treatment until after her duties of pill administration and planned to ask Nurse Carr, a registered nurse,  to examine Townsend.  In support of her judgment that no emergency existed, she provides evidence that Townsend was not bleeding but was at most "spotting;" according to Langston, when she asked Townsend for evidence that she was bleeding, the inmate produced only a tissue with a pink spot.  Langston further testifies that Townsend was not exhibiting any symptoms of severe pain, such as moaning, grabbing her stomach, or complaining loudly.

While a reasonable trier of fact may well believe Langston's explanation, disputes of material facts abound regarding the amount of blood on  Townsend's pad or tissue, her demeanor, and the outward signs of pain.  Depending upon which of the disputed facts it believes, the jury might reject Langston's explanation as a pretext; the jury may believe instead that she knew Townsend was in severe pain but was willing to allow Townsend to suffer while Langston finished her pill duties.  The evidence of her "hateful" retort to Mejia about Townsend "bringing her bloody pad" and her less-than-sympathetic words to Townsend when seeing the pad that "[i]t was not red enough" might lead the jury to believe that she was fully aware of

42

Townsend's pain and suffering but disregarded it.  Accordingly, the material fact disputes render this claim inappropriate for summary judgment.

Langston argues, however, that her evaluation of Townsend's condition represented a medical judgment and cannot form the basis for liability as a constitutional violation.  A violation of the Eighth Amendment occurs only when the medical treatment is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Rogers v. Evans*, 792 F.2d 1052, 1058 (1986) (citations omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106-7.  Accordingly, courts have refused to find violations of the Eighth Amendment when doctors differ on the correct diagnosis, the choice of diagnostic techniques or on the appropriate course of treatment, questions which are matters of medical judgment.  *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (stating that "whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore, not an appropriate basis for liability under the Eighth Amendment.").

In the instant case, however, the evidence shows that Nurse Langston did not examine Townsend at all, except to the extent that she looked at her sanitary pad or pink tissue.  She provided no treatment to Townsend.  She apparently did nothing except look at Townsend's pad or tissue and tell her that she would see her after her pill duties.  (doc. 77, Ex. 14, pp. 22-24).  However, instead of finding that Langston's decision to wait until after "pill pass" was a medical judgment, the jury could conclude that Nurse Langston provided no treatment and made no medical judgment call.  Rather, they could conclude that she was deliberately indifferent to

43

Townsend's need for further diagnosis of and treatment for the severe pain that she was experiencing.

Nurse Langston argues that she recognized that Townsend needed further diagnosis and treatment and that she was not refusing to treat Townsend; she was simply delaying treatment so that she, an LPN, could ask Nurse Carr, an RN, to provide a more thorough examination.    The court notes, however, that Nurse Langston did not immediately try to contact Nurse Carr to see if she could examine Townsend without delay.  Further, no corroborating evidence exists from Nurse Carr that Langston tried to contact her.  Nurse Langston did not provide Townsend with any medication to alleviate her pain while she waited for Nurse Carr to examine her. Accordingly, Townsend presents a genuine issue of material fact as to whether Langston, despite knowing Townsend was in pain and needed care, delayed providing care to finish her pill duties and caused Townsend to suffer pain for hours.

The Eleventh Circuit has recognized that failing to treat an inmate's pain or deliberately delaying treatment of an inmate's pain – even for a relatively short period of time – may violate the Eighth Amendment commands.  *See McElligott*, 182 F.3d at 1257 (finding the district court erred in granting summary judgment for doctor and nurse when a jury could find that they did nothing to alleviate the pain he was suffering as his condition was deteriorating); *Brown*, 894 F.2d at 1538 (recognizing that delay of a few hours in treating an inmate's broken foot could constitute an Eighth Amendment violation).  In addition, courts have found that where medical treatment is delayed deliberately, for non-medical reasons, an inmate may have a constitutionally cognizable injury.  *See, e.g., Monmouth County Correctional Institution Inmates v. Lazaro*, 834 F.2d 326, 346 (3rd Cir. 1987) (finding that where "necessary medical treatment

44

[is deliberately] delayed for non-medical reasons" deliberate indifference could exist); *Durmer v. O'Carroll*, 991 F.2d 64, 68-69 (3rd Cir. 1993) (stating that fact issue existed for the trier of fact on deliberate indifference claim, regarding whether failure to provide physical therapy was deliberate and motivated by non-medical factors, such as cost).   Therefore, Townsend has at the very least shown that genuine issues of material fact exist regarding whether Langston's delay in providing treatment for Townsend's pain constitutes deliberate indifference.

The court will DENY Langston's motion for summary judgment as to Count II.  Because the only other count that includes claims against Langston, Count IV, is duplicative of Count II, the court will dismiss that count.

### D.  Cross-Claims against Jefferson County

Sheriff Hale and Chief Costa filed a cross-claim against Jefferson County (doc.47) and Deputies Chambers and Daniels filed a separate cross-claim against Jefferson County (doc.48), both cross-claims demanding judgment in such sums as Townsend might recover against them. Jefferson County filed a motion to dismiss those cross-claims (doc. 64), and this court deferred ruling on that motion until it ruled on the motions for summary judgment.   As the court will grant summary judgment on Townsend's remaining claims against Defendants Hale and Costa and further, will dismiss Hale and Costa as Defendants, the court will also DISMISS the cross-claims of Hale and Costa against Jefferson County.  Although the court will deny the motion for summary judgment of Deputies Chambers and Daniels as to Counts II and VI, it finds that those remaining counts do not support the Deputies' cross-claims against Jefferson County. Accordingly, the court will DISMISS the cross-claims of Chambers and Daniels against Jefferson County.  As no further claims or cross-claims remain against Jefferson County, the

45

court will DISMISS Jefferson County as a Defendant in this lawsuit.

## V.  CONCLUSION

For the reasons stated above, the court will:

- GRANT the motion for summary judgment of Hale and Costa as to Counts I, V, and VIII;

- DISMISS Count III to the extent that it states a claim against Hale and Costa for providing inadequate funding for inmate/detainee healthcare in the Jail;

- GRANT Hale and Costa's motion for summary judgment as to the remaining claims in Count III;

- DENY the motion for summary judgment of Deputies Chambers and Daniels as to Counts II, and VI;

- DISMISS Count IV as duplicative of Count II;

- DENY the motion for summary judgment of Sallie Langston;

- GRANT Jefferson County's motion to dismiss cross-claims and DISMISS all cross-claims against Jefferson County.

Because no claims remain against Hale and Costa and Jefferson County, the court will DISMISS

Hale and Costa and Jefferson County as Defendants to this lawsuit and enter judgment in their

favor.  The case will proceed against Defendants Chambers, Daniels, and Langston.

Dated this 22nd  day of August, 2008.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE